UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

GERARD STUDER,

        Plaintiff,

        v.                              Case No. 04-C-0524(E)

UNITED GOVERNMENT
SERVICES, LLC,

        Defendant.

**DECISION AND ORDER
GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, DENYING
DEFENDANT'S MOTION FOR LEAVE TO AMEND, AND DENYING AS MOOT
PLAINTIFF'S MOTION TO DISMISS DEFENDANTS COUNTERCLAIMS AND TO
STRIKE DEFENDANT'S SIXTH AFFIRMATIVE DEFENSE**

Gerald Studer is proceeding in this action against defendant United Government Services, LLC (UGS) claiming retaliatory discharge. Studer maintains that he was fired for promoting the advancement of a coworker against the interests of UGS management. UGS's motion for summary judgment is now before this court. Also, before the court is UGS's motion for leave to amend its answer and Studer's motion to dismiss counterclaims and to strike UGS's sixth affirmative defense. For the reasons set forth below, UGS's motion for summary judgment will be granted, UGS's motion for leave to amend will be denied, and Studer's motion to dismiss the counterclaims will be denied and Studer's motion to strike the sixth affirmative defense will be denied.

I. BACKGROUND

UGS hired Studer on October 6, 1997. The company terminated him on November 11, 2003. Eight days after he was terminated, Studer filed an administrative

complaint with the Wisconsin Department of Workforce Development, Equal Rights Division (ERD), against UGS. (Am. Compl. ¶ 17.) Studer then filed a complaint with this court on June 2, 2004, and an amended complaint on June 30, 2004, alleging retaliatory discharge in violation of Title VII of the Civil Rights Act of 1964. (Compl.¶ 18; Am. Compl. ¶ 21.)

On March 24, 2006, UGS filed a notice of motion and motion for leave to amend its August 9, 2004, answer to the amended complaint to include a sixth affirmative defense and counterclaims against Studer. UGS contends that Studer intentionally and without authorization copied confidential information, including confidential patient information and proprietary business information, from UGS's computers after he was terminated. (Def.'s Br. in Supp. of Mot. for Leave to Amend Answer 3.) Additionally, UGS claims it learned of Studer's conduct on December 13, 2005, after Studer amended his Rule 26 disclosures. On December 21, 2005, UGS filed a motion for a protective order to limit the potential disclosure of confidential information contained on CD ROMs, and this court granted the request on January 11, 2006. In response to UGS's motion to amend, Studer filed a motion to dismiss the counterclaims and a motion to strike the sixth affirmative defense from the amended answer on April 17, 2006.

As noted above, on October 6, 1997, UGS hired Studer as a reimbursement technician. (Am. Compl. ¶ 5.) UGS provides administrative, program, integrity, and consulting services for publically funded health care programs including Medicare. (Decl. Matos ¶ 2.) Its headquarters are located at 401 W. Michigan St., Milwaukee, WI. (Am. Compl. ¶ 4.)

UGS administers a Medicare Provider Reimbursement Program. Its Reimbursement Department accepts applications from medical providers who wish to see

2

Medicare patients. UGS reviews their applications and approves or rejects them. If approved, the Reimbursement Department enrolls providers so that they may receive reimbursement for medical care to Medicare patients. (Decl. Matos ¶ 3.)

In June 2001, Studer was promoted to reimbursement supervisor. (Decl. Arnold ¶ 8.) In that position, Studer supervised approximately twenty-one employees—ten UGS employees, nine temporary employees from Kelly Services, and two interns. (Decl. Arnold ¶ 9.) Lisa Gulrud worked at UGS as Kelly Services' representative and assisted the supervision of Kelly Services employees. (Decl. Matos ¶ 4.)

Keva Ford began employment with UGS in 1999 in Customer Service. (Decl. Arnold ¶ 10.) In January 2000, Ford applied for and received a position as a reporting and processing clerk. (Decl. Arnold ¶ 11.) Ford filed a complaint with the Wisconsin Department of Workforce Development, Equal Rights Division (ERD), against UGS in 2001, alleging disability discrimination. (Decl. Arnold ¶ 12.) ERD dismissed Ford's complaint in August 2001. (Decl. Matos ¶ 9.) In January 2003, Ford applied for a reimbursement technician position with UGS. (Decl. Arnold ¶ 13.) Studer asked Ford to apply for the position and told her that she would be good in the job because she was already doing some of the work for the position. (Decl. Studer ¶ 10.)

In 2002 and 2003, UGS's Reimbursement Department usually followed a hiring protocol which provided that when an individual posted for an open position, a copy of that person's credentials was forwarded to the supervisor who issued the notice of the open position. (Decl. Studer ¶ 22.) As the reviewing supervisor examines applicants' credentials, UGS's Human Resources Department interviews candidates. (Decl. Studer ¶ 22.) After the Human Resources Department finishes its interviews, the supervisor conducts his or her own

interview. (Decl. Studer ¶ 22.) The supervisor and the Human Resources Department then consult with one another to decide which candidate to recommend for hire. (Decl. Studer ¶ 22.) This recommendation is passed to the department manager who makes the final decision. (Decl. Studer ¶ 22.)

Connie Yahnke, an employee of the UGS Human Resources Department, was involved in the hiring process for the reimbursement technician position. (Decl. Yahnke ¶ 2.) Studer was the supervisor who conducted initial candidate review; the department manager was John Stoll. (Decl. Studer ¶ 23.)

After Ford applied for the reimbursement technician position, she told Yahnke that she was already performing some of the reimbursement technician job duties. (Decl. Yahnke ¶ 4.) Based on this information, Yahnke decided to consider Ford for the reimbursement technician position and then e-mailed Studer to set up interview times with Ford. (Decl. Yahnke ¶ 5.) Yahnke interviewed Ford on January 21, 2003. (Decl. Yahnke ¶ 7.) After the interview, Yahnke concluded that Ford did not meet the qualifications for the job. (Decl. Yahnke ¶ 8.) In January 2003, Studer asked Ford's former supervisor Tom Hinchcliffe why he believed Ford was not hired. (Decl. Studer ¶ 28.) According to Studer, Hinchcliffe stated that he believed Ford was not hired as a reimbursement technician because she had previously filed a complaint against UGS and that Studer should not hire her for that position. (Decl. Studer ¶ 30.)

On February 9, 2003, Studer e-mailed Stoll opposing the Human Resources Department's conclusion that Ford should not be hired as a reimbursement technician. Later that day, Stoll responded to Studer's e-mail indicating that he had reviewed Ford's resume and agreed with the Human Resources Department's determination that Ford was not

4

qualified for the job. (Decl. Stoll ¶ 5, Ex. A.) According to Studer, Stoll told him that Ford suffered from lupus, which caused her to miss work, and that previously she had filed a discrimination claim against UGS. (Decl. Studer ¶ 34.) Studer claims Stoll told him that he did not want to deal with all of Ford's problems. (Decl. Studer ¶ 34.) Additionally, Stoll asked that Studer look outside the company for reimbursement technician candidates and place an advertisement in the *Milwaukee Journal Sentinel*. (Decl. Studer ¶ 35-36.)

Studer protested this course of action, telling Pam Rownd, an employee in UGS's Human Resources Department, that Ford was a qualified candidate and deserved consideration. (Decl. Studer ¶ 37). Rownd explained that Yahnke previously interviewed Ford for the reimbursement technician position and concluded that Ford was not to be considered for the position. (Decl. Studer ¶ 38.)

On February 20, 2003, Ford filed a second complaint with the ERD and a related lawsuit in federal court in September 2003, alleging that she was denied the reimbursement technician position in retaliation for her 2001 complaint against UGS. (Arnold Decl. ¶ 14.) Studer informed Ford that he would testify in her lawsuit if necessary. (Decl. Studer ¶ 13). In late February 2003, Studer advised Ford that a UGS attorney wanted to talk to him about her claim. (Decl. Studer ¶ 14.) The next month, Studer received a rating of "Achieved Expectations" in his 2003 Performance Review. (Decl. Studer ¶ 59, Ex. 15). He received the same "Achieved Expectations" rating in his 2002 Performance Review, (Studer Ex. 10.), but he had received higher ratings in the past. (Decl. Studer ¶ 59.)

In early July 2003, Ford went to mediation on her claim before the ERD. UGS attorney Dawn Matos was in attendance. (Decl. Ford ¶ 11.) On August 20, 2003, Ford interviewed for the reimbursement technician position with Margo McCormick in UGS's

5

Human Resources Department and on August 21, 2003, she interviewed with Studer, her supervisor. (Decl. Ford ¶ 13.) Ford also interviewed with Stoll. (Decl. Ford p 15.) Ford was hired as reimbursement technician on October 1, 2003. (Decl. Ford ¶ 17.) According to Studer, shortly after Ford was hired as a reimbursement technician, Stoll told him to document any infractions by Ford, to which Studer replied that he would treat Ford like any other employee (Decl. Studer ¶ 51.)

Studer claims that his work environment changed when he began advocating that Ford be hired as a reimbursement technician. (Decl. Studer ¶ 55.) According to Studer, in 2002, Stoll allowed him to be involved in conference calls, that Stoll would give Studer gifts and take him to lunch. (Decl. Studer ¶ 55.) However, in 2003, after Studer pushed for Ford to be hired, Stoll ceased providing gifts to Studer and their relationship was not as friendly. (Decl. Studer ¶ 56.)

In late October 2003, Studer claims that problems began with the work performances of Ellissa Roerish and Teri Klaus, two Kelley Services employees under his supervision. Roerish had worked in the Reimbursement Department since February 2003, and Kraus had worked in the Reimbursement Department commencing January 2003. (Decl. Matos ¶ 5.)

On October 30, 2003, Roerish filed a sexual harassment claim against Studer. (Decl. Arnold ¶ 15.) Jennifer Arnold, a consultant in UGS's Human Resources Department, investigated Roerish's complaint. (Decl. Arnold ¶ 16.) Arnold and Matos, UGS's General Counsel, met with Roerish on October 31, 2003, to discuss her harassment complaint. (Decl. Arnold ¶ 17.) During this meeting, Roerish gave Arnold and Matos a list of Studer's comments and behaviors that concerned her. (Decl. Arnold ¶ 18; Arnold Ex. C.) These

6

concerns included: (1) a comment by Studer in midsummer 2003, about the dress she was wearing which made her uncomfortable—although Roerish could not recall exactly what Studer said; (2) in mid-September 2003, Studer commented "That was tits" in front of Roerish and another co-worker; (3) in mid-September 2003, Studer again commented on Roerish's outfit and said something to the effect of "pretty girls catch my attention"; (4) on October 17, 2003, Studer, in the middle of a conversation about a work issue, told Roerish that her boyfriend was really lucky to have her because she was so attractive; (5) on October 28, 2003, Studer told Roerish that she could use the shelf on his office floor as a desk, and then later offered to carry her into his office; (6) generally, Studer stood very close to Roerish when talking with her, tried to lean over her shoulder or otherwise be close enough to touch his body to hers. (Decl. Arnold ¶ 20; Arnold Ex. C.) After this meeting, Arnold and Matos decided to further investigate Roerish's complaints. (Decl. Arnold ¶ 21.)

On October 31, 2003, Studer learned of Roerish's accusations from Arnold. (Decl. Studer ¶ 90.) In response, Studer mentioned that Roerish was performing poorly at work; Arnold then instructed Studer to document any problems with staff. (Decl. Studer ¶ 92.) On Sunday, November 2, 2003, Studer e-mailed Gulrud and Stoll, describing the problems he was having with staff. (Decl. Studer ¶ 93, Ex. 23.) According to Studer, this e-mail was sent in response to Arnold's suggestion to document performance issues. (Decl. Studer ¶ 93.) In that e-mail, Studer asked what Gulrud and Roerish had talked about when they met, (Decl. Stoll ¶ 7, Studer Ex. 26), and he stated that he was considering whether to terminate Roerish and Kraus. (Decl. Stoll ¶ 8; Stoll Ex. B.; Studer Ex. 26). Before Roerish filed the sexual harassment complaint, Studer had not complained to the Human Resources

7

Department or to Kelly Services management regarding Roerish's or Kraus' job performance. (Decl. Arnold ¶ 32.)

On November 3, 2003, Stoll confronted Studer about the e-mail sent on November 2, 2003. (Decl. Studer ¶ 94.) According to Studer, "Stoll began screaming at me, telling me that the content of my e-mail represented retaliation and harassment. Mr. Stoll asked me what I was thinking when I wrote the e-mail. I explained that I was merely doing what Ms. Arnold asked me to do in our October 31, 2003 meeting." (Decl. Studer ¶ 94.) Also on that day, as part of their investigation of Roerish's sexual harassment claim, Arnold and Matos met with Teri Kraus to discuss Studer's behavior. (Decl. Arnold ¶ 22.)

On November 4, 2003, Arnold and Matos met with Studer to discuss Roerish's and Kraus' allegations of inappropriate behavior. (Decl. Arnold ¶ 26.) Studer denied most of the allegations, and offered explanations for the rest of his statements and actions. (Decl. Arnold ¶ 27.) Further, Studer criticized Roerish's and Kraus' job performance. (Decl. Arnold ¶ 28.) In this conversation, Studer told Arnold and Matos that Roerish made excessive personal phone calls and took excessive time processing files. (Decl. Arnold ¶ 29.) He added that Kraus had a negative attitude, and that Kraus and Roerish had reacted negatively when Studer told his staff that they needed to work harder and that those employees who were not performing satisfactorily would be disciplined. (Decl. Arnold ¶ 30.)

On November, 5, 2003, Studer e-mailed Arnold with a string of documents purportedly showing Roerish's and Kraus' work performance and attitude issues. (Decl. Arnold ¶ 33, Arnold Ex. D.) In one of the e-mails, Studer requested that Kraus be disciplined. (Decl. Studer ¶ 88.) Also, Studer e-mailed Arnold accusing Roerish of several types of misconduct; a second e-mail included the complaints of other employees about Kraus' work

8

on a particular file. (Decl. Arnold ¶ 34, Arnold Ex. D.) Finally, Studer faxed Arnold a copy of his memorandum of October 4, 2003—a summary of department policies and a quality control survey rating the employees in his department. (Decl. Arnold ¶ 36, Arnold Ex. E.)

During the next few days, Arnold and Matos spoke with other employees in Studer's department, and met again with Roerish, Kraus, and Studer. (Decl. Arnold ¶ 38.) Studer repeated his denial of some of the allegations against him, and offered explanations for his other comments and actions. (Decl. Arnold ¶ 39.) For example, Studer denied looking down Roerish's dress when commenting on her dress, but acknowledged that he is significantly taller than her. (Decl. Arnold ¶ 40.) Studer admitted telling Roerish that her boyfriend was lucky to have her, but justified the comment by saying that he was trying to cheer her up. (Decl. Arnold ¶ 41.) Studer admitted making the comment "that was tits," and explained that while he agreed that the comment was inappropriate, he was referring to a motorcycle. (Decl. Studer ¶ 96.)

After Arnold concluded her investigation, she reviewed the information with Steve Holubowicz, Cheryl Zima, and Sandy Coston, three of UGS's managers. (Decl. Arnold ¶ 45.) UGS management terminated Studer on November 11, 2003.

UGS claims that Studer was terminated for harassment and retaliation in violation of UGS company policy. In particular, UGS maintains that Studer violated the anti-harassment and anti-retaliation policy included in the UGS Employee Guide. The policy states:

> Harassment on the basis of an employee's race, color, religion, marital status, sex national origin, ancestry, age, disability . . . is expressly prohibited under this policy. . . . In general, harassment means persistent and unwelcome conduct or actions on any of the bases named above which interferes with an employee's work

> or creates an intimidating, hostile or offensive work environment. Sexual harassment is one type of harassment and includes unwelcome sexual advances or unwelcome verbal or physical contact of a sexual nature. . . . UGS views harassment and retaliation of any kind against an employee bringing a complaint of harassment or assisting in the workplace investigation of a complaint of harassment to be among the most serious breaches of workplace behavior. Be assured that making a harassment complaint will not lead to adverse employment action, and retaliation is strictly prohibited.

Studer received a copy of the UGS Employee Guide on April 10, 2001. (Decl. Arnold ¶ 3; Arnold Ex. A.)

On November 19, 2003, Studer filed an administrative complaint with ERD. (Am. Compl.¶ 17.) He received a right to sue letter in March 2004, commenced this action on June 2, 2004, and amended his complaint on June 30, 2004, claiming retaliatory discharge in violation Title VII of the Civil Rights Act of 1964 codified at 42 U.S.C. 2000e *et seq*. (Compl. ¶ 18; Am. Compl. ¶ 21.) The amended complaint asserts that Studer assisted Ford with her retaliation complaint, recommended her for a position in the Reimbursement Department against the wishes of his supervisors, and was fired due to those activities. (Am. Compl. ¶¶ 11, 15, 21.)

## II. LEGAL STANDARD

Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In determining whether a genuine issue of material fact exists, the court may consider the depositions, answers to interrogatories, admissions, pleadings and affidavits that are part of the record. A bare contention that a material fact exists is not enough to create a factual dispute. *Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000). "To survive summary

10

judgment, the nonmoving party must make a sufficient showing of evidence for each essential element of its case which it bears the burden at trial." *Kampmier v. Emeritus Corp.*, 472 F.3d 930, 936 (7th Cir. 2007). In determining whether a genuine issue of material fact exists, the court must construe all facts and reasonable inferences in a light most favorable to the nonmoving party. *Hilt-Dyson v. City of Chicago*, 2282 F.3d 456, 462 (7th Cir. 2001).

### III. ANALYSIS

Title VII prohibits an employer from discriminating against an employee who has opposed an unlawful employment practice. 42 U.S.C. s 2000e-3(a). A plaintiff claiming retaliation by an employer for complaining about employment discrimination has two routes—a direct and indirect route—to prove a prima facie case and avoid summary judgment. *Stone v. Indianapolis Pub. Util. Div.*, 281 F.3d 640, 644 (7th Cir. 2002).

Under the direct route, a plaintiff must present direct evidence that (1) he engaged in a protected activity, (2) suffered an adverse employment action, and (3) there is a causal relationship between the two. *Luckie v. Ameritech Corp.*, 389 F.3d 708, 714 (7th Cir. 2004) (citing *Haywood v. Lucent Tech.*, 323 F.3d 524, 531 (7th Cir. 2003)); *see also Stone*, 281 F.3d 640, 644 (stating that a plaintiff may "present direct evidence (evidence that establishes without resort to inferences from circumstantial evidence) that he engaged in protected activity (filing a charge of discrimination) and as a result suffered the adverse employment action of which he complains"). If the plaintiff's direct evidence is contested, the case should be tried unless "the defendant presents unrebutted evidence that it would have taken the adverse employment action against the plaintiff anyway, 'in which event the defendant's retaliatory motive, even if unchallenged, was not a but-for cause of plaintiff's harm.'" *Haywood*, 323 F.3d at 531 (quoting *Stone,* 281 F.3d 640).

11

Because Studer fails to (1) present direct evidence that he engaged in a protected activity and (2) there is a causal connection between the alleged protected activity and his termination of employment, he cannot succeed under the direct route. "The key inquiry in the direct method is whether [the employer] was aware of the allegations of discrimination at the time of [it's] decisions to . . . terminate [the plaintiff's] employment." *Luckie*, 389 F.3d at 715. It is not enough to show that management could have or should have known about the plaintiff's complaint; management must have actual knowledge of the complaint for its decision to terminate the plaintiff to be retaliatory. *Id.* Therefore, at a minimum, Studer must present evidence that supports a reasonable inference that those responsible for terminating him knew of his opposition to alleged discriminatory treatment of Ford. *See id.*; *see also Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006) ("Merely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient." (citing *Gleason v. Mesirow Fin., Inc.*, 118 F.3d 1134 (7th Cir. 1997))).

Studer presents no evidence that members of the UGS management knew his advocacy of Ford was opposition to perceived discriminatory treatment of Ford. Although Studer believes that he was opposing discriminatory treatment of Ford, he never indicated this belief to HR Department Manager Stoll, to UGS's HR consultant Arnold, to UGS's attorney, Matos, or UGS' managers Holubowicz, Zima, or Cotton. Studer maintains that Stoll opposed Ford for the reimbursement technician position because she had lupus and had filed a suit against UGS and that despite Stoll's instruction not to consider Ford for the job, he continued to support Ford. However, while Studer maintains that Ford was qualified for the position, the record in this case does not disclose Studer's support for Ford constituted opposition to a

12

discriminatory employment practice or that Stoll or UGS management recognized Studer's support for Ford as opposition to a discriminatory employment practice. Further, while Stoll may have directed Studer to closely monitor Ford in the reimbursement technician position, it is uncertain how this could be considered unlawful treatment of Ford or how Studer's response that he would monitor all persons on his staff in the same manner constituted opposition to unlawful employment practices. Thus, Studer fails to show that any person at UGS responsible for terminating his employment had actual notice that he was opposing discriminatory practices involving Ford.

Studer further submits that the short time between when Ford was hired as reimbursement technician on October 1, 2003, and his firing by UGS on November 11, 2003, establishes a causal connection. However, "mere temporal proximity between [engaging in a protected activity] and the action alleged to have been taken in retaliation for that [action] will rarely be sufficient in and of itself to create a triable issue." *Stone*, 281 F.3d at 644; *see e.g., Burks v. Wis. Dep't. of Transp.* 464 F.3d 744, 758-59 (7th Cir. 2006); *Billow v. Much Shelist Freed Denenberg Ament & Rubenstein, P.C.*, 277 F.3d 882, 895 (7th Cir. 2001) (finding a two-month lapse insufficient because "[t]he mere fact that one event preceded another does nothing to prove the first event caused the second"); *Contreras v. Suncast Corp.*, 37 F.3d 756, 765 (7th Cir. 2001) (finding that without other evidence, even a gap of less than one month between the plaintiff's filing of an EEOC charge and employer's decision to terminate his employment was insufficient to show causation). Further, it is not the hiring of Ford that constitutes the protected activity, but Studer's alleged opposition to UGS's hiring practices.

13

The evidence presented by Studer indicates that he proclaimed his support of Ford to his supervisor in a discussion with Stoll in January 2003, (Decl. Studer ¶ 43-45); in an e-mail to Stoll in which he advocated for Ford on February 9, 2003, (Decl. Studer ¶ 53), and when he placed his post-interview recommendation of Ford on Stoll's desk on August 21, 2003, (Decl. Studer ¶ 58). However, this is no evidence that Studer expressed his support for Ford to UGS management after August 21, 2003. Considering the lack of actual notice to UGS that Studer was opposing its perceived discriminatory practices, the temporal relationship shown by Studer is insufficient to establish a causal connection between his advocacy for Ford and any adverse job action by UGS.

Under the indirect evidence methodology, a plaintiff must show that (1) he engaged in protected activity; (2) he performed his job according to his employers' legitimate expectations; (3) he suffered an adverse employment action; and (4) he was treated less favorably than similarly situated employees who did not engage in a protected activity. *Hilt-Dyson,* 282 F.3d at 465 (citing *Stone*, 281 F.3d 640). "[F]ailure to satisfy any element of the prima facie case proves fatal to the retaliation claim." *Id.* On the other hand, if the employee satisfies these elements and proves a prima facie claim, the burden shifts to employer to present "a legitimate, noninvideous reason for adverse employment action." *Id.* Once the defendant presents a legitimate reason for the adverse action, the burden shifts back to the plaintiff "to demonstrate the pretextual nature of the proffered reason." *Id.* If the plaintiff fails to show pretext, summary judgment must be granted for the defendant. *Id.*

With due regard for these requirements, Studer is unable to avoid summary judgment inasmuch as he (1) fails to meet the required elements of a prima facie case,

14

pursuant to the indirect method of proof, and (2) even if all the requirements were met, he cannot show that UGS's proposed reasons for terminating his employment are pretextual.

First, in addition to Studer's inability to demonstrate that he engaged in a protected activity as discussed above, he falls short of demonstrating that he performed his job according to UGS's legitimate expectations. Studer was given a copy of the UGS Employee Guide, which contained an anti-harassment and anti-retaliation policy. In October 2003, Roerish complained that Studer sexually harassed her. Subsequently, Arnold and Matos met with Roerish, Kraus, Studer and other employees at UGS, while investigating Roerish's claim. Afterward they presented Studer with a list of alleged actions that led Roerish to file the complaint, and Studer was allowed the opportunity to deny or explain each allegation. As discussed above, Studer admitted making comments about Roerish's appearance and making an inappropriate comment about a motorcycle while working. Further, after the sexual harassment complaint was filed, Studer, in an e-mail to Arnold and Stoll, stated that Roerish should be fired for poor work performance. Given these facts and in light of UGS's anti-harassment and anti-retaliation policies, Studer has not demonstrated that he was performing his job to his employer's legitimate expectations.

Second, Studer fails to present any evidence that he was treated less favorably than similarly situated employees. Because Studer ignores this requirement of the prima facie case, he cannot withstand summary judgment. *See Burks*, 464 F.3d at 759; *Kennedy v. Schoenberg, Fisher & Newman*, 140 F.3d 716, 727 (7th Cir. 1998) (finding failure of plaintiff to satisfy fourth element of prima facie retaliation claim).

Finally, even if Studer were capable of establishing a prima facie case under the indirect methodology, he cannot show that UGS's reasons for terminating his employment

15

were pretext. "Pretext is a lie, specifically a phony reason for some action. *Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 737 (7th Cir. 2006) (citing *Russell v. Acme Evans, Co.*, 51 F.3d 64 (7th Cir. 1995).

To prove pretext, Studer must demonstrate that UGS's explanation for his termination is not credible, *Id.*, and that UGS "did not believe the proffered reasons for termination," *Burks*, 464 F.3d at 754-55. Hence, the court must focus on whether the employer's proffered reason for terminating the employee is "a lie to cover up a true motivation" of retaliation. *Burks*, 464 F.3d at 754; *see also Gleason,* 118 F.3d at 1139 ("[T]he federal anti-discrimination laws do not authorize judges to sit as a kind of super personnel department weighing the prudence of employment decisions." (quoting *Giannanopolis v. Brach & Brock Confections, Inc.*, 109 F.3d 406 (7th Cir. 1997)).

UGS maintains that it terminated Studer for exercising poor judgment and for violating the UGS anti-harassment and anti-discrimination policy. However, Studer does not meet his burden of showing that UGS management knows these purported reasons are illegitimate. Studer admitted to using inappropriate comments at work, which were part of the basis for Roerish's sexual harassment claim. Studer also sent an e-mail recommending Roerish be fired shortly after Roerish initiated her sexual harassment claims against him. Also, before Roerish filed her complaint, Studer had not recommended to UGS management that Roerish be fired or disciplined for poor work performance. Although Studer was asked by Arnold to document problems he was having with his employees, the record does not suggest that UGS fabricated Roerish's harassment allegations against Studer as a pretext for retaliation. For these reasons, Studer cannot make out a prima facie case under the direct or indirect routes and that summary judgment is appropriate.

As a consequence, UGS's motion to amend is moot.

Now, therefore,

IT IS ORDERED that defendant's motion for summary judgment is granted.

IT IS FURTHER ORDERED that defendant's motion for leave to amend its Answer is denied.

IT IS FURTHER ORDERED that plaintiffs motion to dismiss defendant's asserted counterclaims and strike defendants asserted sixth affirmative defense is denied.

Dated at Milwaukee, Wisconsin, this 29th day of August, 2007.

BY THE COURT

s/ C. N. CLEVERT, JR.
C. N. CLEVERT, JR.
U. S. DISTRICT JUDGE